Filed 10/29/14  AMS Plastics v. Speculative Product Design CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| AMS PLASTICS, INC., | D064369 |
| Plaintiff, Cross-defendant and Appellant, | |
| v. | (Super. Ct. No. 37-2012-00091378-CU-BC-CTL) |
| SPECULATIVE PRODUCT DESIGN, LLC, | |
| Defendant, Cross-complainant and Respondent. | |

APPEAL from an order of the Superior Court of San Diego County, John S. Meyer, Judge.  Affirmed.

Duckor Spradling Metzger & Wynne, Scott L. Metzger and Robert M. Shaughnessy for Plaintiff, Cross-defendant and Appellant.

Hopkins & Carley, Maria S. Bellafronto, Allonn E. Levy and Ryan D. Cunningham for Defendant, Cross-complainant and Respondent.

This appeal arises out of the court's denial of plaintiff, cross-defendant and appellant AMS Plastics, Inc.'s (AMS's) motion seeking attorney fees after it prevailed in

this action against defendant, cross-complainant and respondent Speculative Product Design, LLC (SPD) to recover on purchase orders/invoices that SPD failed to pay. The court based its ruling on the fact that the purchase orders/invoices did not have an attorney fee clause. It was only after the trial concluded that AMS sought attorney fees based upon different agreements, an application for credit and a draft manufacturing agreement, that were not the basis for its claims at trial.

On appeal AMS asserts the court erred in denying its request for attorney fees because it prevailed on (1) the application for credit SPD provided to AMS at the outset of their relationship and (2) the draft manufacturing agreement AMS asserts that SPD sued upon in its cross-complaint. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Parties*

AMS is a California corporation based in El Cajon, California. It also has a manufacturing facility in Tijuana, Mexico. AMS offers custom injection molding and other manufacturing services. Injection molding is the process of forcing or injecting melted plastic into a steel mold cavity, referred to as a tool.

SPD is a designer and manufacturer of electronic accessories. SPD is headquartered in Palo Alto, California, and also operates a facility in Tijuana, where plastic electronics cases are finished by packaging for retail sale. SPD designs and sells protective cases for iPhones and MacBook laptop computers.

B. *Business Relationship Between SPD and AMS*

In January 2011 SPD approached AMS to discuss the possibility of AMS becoming a secondary supplier of plastic iPhone cases. Greg Mercurio, SPD's then-Vice President of Operations, traveled to Tijuana to meet with Scott Modic, AMS's then-Vice President of Sales, to tour AMS's facility. At that time, the parties discussed the possibility of AMS providing SPD with plastic iPhone cases. SPD provided AMS with drawings and files for the project, and AMS provided quotes for creating tools that would be used to manufacture SPD's cases.

However, SPD chose not to purchase new tools from AMS. Rather, SPD requested AMS to modify an existing set of tools created by another supplier, so the tool could manufacture a "universal" iPhone 4 case that would fit both the current iPhone 4 and the anticipated iPhone 4S. At that time, AMS received one set of tools that consisted of a "case" tool that created the hard outer shell of the cell phone case and an "overmold" tool that created the soft, inner portion of the case. To assemble the case in final form, the hard outer case is molded from the case tool and then a "camera ring" insert and a "logo" insert are created.

1. *Application for credit*

In April 2011, at the time AMS began its work for SPD, AMS sent SPD an application for credit form, stating that the form needed to be completed, signed and returned before AMS could set up SPD as a customer. SPD returned a completed and signed credit application form. At page 2 of the application for credit form there is an attorney fees clause that states:

"In the event suit to enforce payment becomes necessary, such suit may be brought in San Diego County, California at seller's option. Seller will be entitled to recover all collection costs, attorney fees and interest at 18 [percent] annual percentage rate, on all amounts found to be due and payable."

2. *Draft manufacturing agreement*

In November 2011 the parties exchanged versions of a proposed manufacturing and supply agreement (draft manufacturing agreement). The draft manufacturing agreement contained an attorney fee provision that stated: "Should either party hereto bring an action to enforce the terms and conditions contained herein, the prevailing party shall be entitled to reasonable attorney's fees as well as costs of suit." However, no version of the draft manufacturing agreement was ever signed by either party.

C. *Purchase Orders/Invoices*

In April 2011 AMS sent SPD a quotation for the modification of tools, and the next day SPD issued a purchase order for the modification. In July 2011 SPD issued additional purchase orders, requesting AMS to modify 10 additional iPhone4 tools so they could be used to manufacture a new iPhone 4 Universal case, and requested four Mac Book tools. AMS began working on these tools as well, but by mid-fall 2011 SPD and AMS realized most of the iPhone 4 tools were not able to produce acceptable iPhone 4 Universal cases. Specifically, in November 2011 AMS prepared 750 samples of what it believed were marketable parts from the best iPhone tools available to AMS, and sent 250 of them for SPD to inspect. However, SPD inspected the 250 samples, and rejected them all.

4

D. *Termination of Relationship*

SPD claimed that AMS could not produce satisfactory cases using the modified tools. SPD thereafter informed AMS that it could not proceed further with the project until the draft manufacturing agreement was signed. Though multiple versions were exchanged, AMS never signed the draft manufacturing agreement. Because the parties could not agree on the terms of the draft manufacturing agreement, and because SPD believed none of the actual cases AMS sent to SPD met its specifications, in December 2011 SPD terminated its relationship with AMS.

After SPD terminated the relationship, AMS demanded payment due and owing under the outstanding invoices. When SPD refused to pay, AMS initiated the instant action.

E. *Procedural History*

1. *AMS sues SPD for breach of the purchase orders/invoices*

In January 2012 AMS sued SPD for breach of contract and common-count claims, using a form complaint for breach of contract actions. The complaint alleged SPD breached the five purchase orders/invoices relating to the modification of various tools. However, AMS's complaint did not allege any breach of any version of the draft manufacturing agreement or the application for credit. AMS did check the box in the form complaint for attorney's fees by agreement or statute. However, AMS did not identify any attorney fees provision or fee-shifting statute in its complaint. Moreover, AMS's complaint provided no fact allegations that would support a recovery of attorney fees. The complaint sought approximately $170,000 in damages.

5

2. *SPD's cross-complaint*

In April 2012 SPD filed a cross-complaint for breach of contract and breach of implied warranties based on AMS's alleged failure to deliver commercially viable cases. SPD's cross-complaint alleged the contract consisted of "the written quotations after the parties' discussions, as well as the written purchase orders and invoices." SPD's cross-complaint did not identify the draft manufacturing agreement as part of its alleged contract. SPD's cross-complaint did not assert a right to attorney fees and did not allege any facts that could support a claim for attorney fees. The cross-complaint sought the return of approximately $120,000 previously paid to AMS, as well as $640,000 that SPD allegedly had to pay to purchase substitute goods from other suppliers.

3. *The parties' pretrial discovery*

SPD propounded on AMS a request for production of documents, requesting AMS produce all documents it alleged constituted the contract it claimed SPD breached. AMS responded that it would produce all nonprivileged, responsive documents. However, it did not produce any document containing an attorney fee provision and did not produce the application for credit in response to the request.

SPD also propounded form interrogatories on AMS, including form interrogatory 50.1, which asked AMS to identify the documents that "comprise, evidence or modify the agreement alleged in the pleadings." AMS responded by stating: "The documents that make up the parties' agreement that is the subject of this action are the purchase orders and invoices identified in the Complaint." In December, 2012 SPD served a supplemental request for production of documents, asking that AMS produce any

6

subsequently discovered responsive documents. AMS responded that it had no later-acquired documents.

In August 2012 SPD responded to AMS's form interrogatories, including request No. 50.1. SPD identified the contract upon which SPD based its cross-complaint as follows: "The documents that make up the parties' agreement at issue in this litigation are the requests for quotations, purchase orders and invoices, copies of which have been provided to AMS."

4. *AMS's attempt to introduce a new contract at trial*

On March 7, 2013, the night before the pretrial conference, AMS's counsel sent an e-mail to SPD's counsel attaching the application for credit. AMS proposed that this document be added to the parties' joint exhibit list for introduction at trial. SPD's counsel objected, and the issue was brought before the trial court during the hearing on the parties' motions in limine.

At that hearing, SPD's counsel objected to the inclusion of the application for credit because it had not been disclosed in discovery. AMS agreed that it would not seek to admit that document at trial, but wanted to retain the right to use it posttrial. The court excluded the application for credit from the evidence that would be received at trial.

5. *AMS based its claims at trial on the purchase orders and invoices*

At trial AMS based its breach of contract and common-count claims on the five sets of invoice/purchase orders relating to tool modification. The purchase order/invoices were described in AMS's trial brief as the documents that were the basis for AMS's claim for breach of contract, and each was admitted into evidence at trial. On the final day of

7

trial, at AMS's request, the application for credit was marked for identification, but was never admitted into evidence.

6. *SPD's evidence on its cross-complaint*

At trial it was SPD's contention that "the issuance of the written quotations, purchase orders and corresponding invoices ma[de] up the parties' 'Agreement.'" (Italics omitted.) At the conclusion of trial, SPD's counsel stated to the jury that SPD's assertion of a partly written, partly oral contract was not based on the draft manufacturing agreement: "[SPD] never asserted before or during the trial that the Manufacturing Agreement was binding or enforceable. In fact, I [trial counsel] tossed the Manufacturing Agreement aside in my closing argument, conceding to the jury that it was an unsigned and unenforceable document and *not* the basis of SPD's claims against AMS."

7. *AMS prevails at trial*

Following trial, the jury returned a verdict in favor of AMS on its claims. AMS was awarded $136,781 in damages. AMS also prevailed against SPD on SPD's cross-complaint.

8. *Motion for attorney fees*

AMS thereafter moved for an award of attorney fees in the amount of $226,311. AMS based its motion on two separate grounds: (1) that the application for credit was part of the contract upon which AMS sued, and (2) that AMS was entitled to fees under a "reciprocity" theory because SPD requested them in its cross-complaint by seeking to enforce the draft manufacturing agreement.

8

SPD opposed the motion, arguing that (1) AMS had offered no pleadings demonstrating any entitlement to fees; (2) AMS had served discovery responses contrary to such entitlement; and (3) AMS's posttrial identification of the credit agreement attorney fees provision was irrelevant because the application for credit was a different contract from the purchase orders/invoices upon which AMS prevailed at trial. As to SPD's cross-complaint, SPD argued that it never asserted in any pleading that it had a right to collect attorney fees, and no evidence was presented to the jury that evidenced such a right. Therefore, according to SPD, there could be no "reciprocity" in favor of AMS since SPD had no right to collect fees had it prevailed.

9. *Court's ruling*

Thereafter, the trial court issued its ruling and denied an award of attorney fees to AMS. In doing so, the court noted that, "[i]n the complaint, throughout discovery, and in their trial brief, AMS described the contract under which AMS sought relief as five purchase orders and related invoices. The day before trial, AMS sought to add the application for credit as part of the contract upon which AMS sued. The Application for Credit was not admitted into evidence. The contract presented to the jury consisted of purchase orders and related invoices. The application for credit was not part of the contract upon which plaintiff prevailed. Accordingly, AMS did not prevail on a contract that included the Application for Credit."

The court further stated that "AMS does not identify any language in the purchase orders, invoices or Application for Credit that incorporated the language of the Application for Credit." The court also rejected AMS's claim that the "oral and written

9

agreement alleged by [SPD] also included the written Manufacturing Agreement that was exchanged between AMS and [SPD] in November/December 2011, but was not signed by the parties." As the court noted, "The Manufacturing Agreement was not included" in the cross-complaint's allegations as to what formed the basis of the agreement between the parties. Only the purchases orders and invoices were included.

The court also addressed AMS's contention that Greg Mercurio, SPD's then-Vice President of Operations, confirmed in his deposition testimony that the terms of the written manufacturing agreement were part of the agreement SPD sought to enforce by way of its cross-complaint. In this regard, the court stated, "Mr. Mercurio appears to be speaking as to the terms of performance under the agreement between the parties. Nowhere in the deposition transcript provided by AMS does Mr. Mercurio testify that the agreement they were operating under included an attorney fee provision."

Finally, the court rejected AMS's contention that SPD could have sought attorney fees if it had prevailed because SPD "did not pray for attorney fees in its cross-complaint."

## DISCUSSION

A. *The Jury Verdict in Favor of AMS Was Not Based Upon a Contract Containing an Attorney Fee Provision*

"[R]ecoverable litigation costs . . . include attorney fees, but only when the party entitled to costs has a legal basis, independent of the cost statutes and grounded in an agreement, statute, or other law, upon which to claim recovery of attorney fees." (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 606 (*Santisas*); Code Civ. Proc., §§ 1032,

10

subds. (a)(4) & (b), 1033.5, subd. (a)(10), (c)(5); Civ. Code,[1] § 1717, subd. (a).) Section 1717 governs the award of attorney fees based upon a contract and authorizes an award of attorney fees to a prevailing party if the contract provides for an award of attorney fees. (§ 1717, subd. (a).) Thus, the first issue to examine when evaluating a claim for attorney fees under section 1717 is whether the contract at issue authorizes an award of attorney fees. (*Khajavi v. Feather River Anesthesia Medical Group* (2000) 84 Cal.App.4th 32, 62 [without an attorney fees provision within the contract, a contract claim for attorney fees will fail].)

To this end, section 1717 provides in part: "(a) In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs. [¶] . . . [¶] Reasonable attorney's fees shall be fixed by the court, and shall be an element of the costs of suit."

However, if a party claiming attorney fees did not base its claims at trial on a contract containing an attorney fee provision, it may not recover such fees under section 1717 . (*Silverado Modjeska Recreation & Park Dist. v. County of Orange* (2011) 197 Cal.App.4th 282, 312 (*Silverado*); *Brittalia Ventures v. Stuke Nursery Co., Inc.* (2007) 153 Cal.App.4th 17, 20 (*Brittalia*).)

---

[1]     All further undesignated statutory references are to the Civil Code.

11

*Brittalia* is instructive. In *Brittalia, supra,* 153 Cal.App.4th 17, the plaintiff sued for breach of express and implied warranties in connection with the purchase of 14,000 walnut trees from the defendant. The plaintiff argued the parties' contract consisted only of a written purchase proposal and the plaintiff's check. (*Id.* at pp. 21-22.) The defendant contended the contract also included a series of invoices and receipts containing standard, preprinted warranty disclaimers. (*Id.* at pp. 20-22.) The plaintiff prevailed at trial and was awarded attorney fees. (*Id.* at pp. 22-23.) The Court of Appeal reversed the attorney fees award because the plaintiff had not sued the defendant under a contract containing an attorney fees provision. (*Id.* at p. 29.) The written purchase proposal on which the plaintiff sued did not contain an attorney fees provision. Rather, the only documents that contained an attorney fees provision were the invoices and receipts, on which the defendant had relied, and which the plaintiff had successfully proven were not a part of the contract. (*Id.* at p. 31.) The Court of Appeal concluded section 1717 's mutuality of remedy for contractual attorney fees claims did not apply: "[The plaintiff] cannot be allowed to win on its contract action by championing one contract without an attorney fee provision, and then turn around and ask for attorney fees as prevailing party based on a different contract, with an attorney fee provision, that [the plaintiff] had to defeat to secure its victory . . . . '[S]ection 1717 . . . only comes into play where a contract specifically provides for attorney fees. "The primary purpose of . . . section 1717 is to ensure mutuality of remedy for attorney fee claims under contractual attorney fee provisions." [Citation.] It cannot be bootstrapped to provide for attorney fees for breach

12

of a contract that has no attorney fees provision.'" (*Brittalia, supra,* 153 Cal.App.4th at p. 31.)

Likewise in this action, AMS brought an action to enforce purchase orders/invoices that did not contain an attorney fee provision. In fact, AMS admits as much in its opening brief: "[T]he contract upon which AMS successfully sued [SPD] was premised upon the purchase orders and invoices exchanged as between the parties." AMS also prevailed on SPD's cross-complaint, but the cross-complaint was also based on the purchase orders/invoices, not the unsigned draft manufacturing agreement.

AMS attempts to distinguish *Brittalia* based on the assertion that the unsuccessful *Brittalia* defendant "asserted an entirely different contract," and in this case "AMS sought attorney fees based upon: (1) the fee provision contained in the contract it successfully enforced; and (2) the fee provision in the contract that [SPD] tried to enforce." This contention is unavailing.

The purchase orders/invoices AMS sued upon in this action are even less related to the application for credit than the contracts in *Brittalia*. AMS's application for credit deals with an issue different from SPD's failure to pay the purchase orders/invoices: SPD's creditworthiness. Therefore, *Brittalia* supports the trial court's finding that "[t]he Application for Credit was not part of the contract upon which plaintiff prevailed."

Moreover, as discussed, *ante*, AMS never alleged the application for credit was part of its contract. AMS also failed to produce the document in response to discovery requests seeking all writings which made up the contract upon which AMS was suing. In its trial brief, AMS identified the documents that constituted the contract at issue, but did

13

not mention the application for credit. SPD propounded interrogatories requesting AMS to identify all documents it contended comprised the agreement upon which AMS was suing. In AMS's responses AMS stated the contract consisted of the "purchase orders and invoices identified in the Complaint." Additionally, as discussed, *ante*, SPD's cross-complaint was also based upon the purchase orders/invoices, not the draft manufacturing agreement. Based upon these facts, the trial court properly found that "AMS did not prevail on a contract that included the Application for Credit."

Further, it would have been error for the court to consider the application for credit as part of the contract for the first time after the trial concluded. In *Silverado, supra,* 197 Cal.App.4th at page 312, this Court of Appeal held it was reversible error for a trial court to adjudicate in a posttrial fee motion the issue of whether a contract that had not been adjudicated at trial entitled the prevailing party to attorney fees.

As this court explained in *Silverado*, adjudicating a breach of contract claim in the context of a posttrial motion, rather than at trial, is improper: "[We] are not aware of any authority that would support the proposition that a trial court may adjudicate a breach of contract in the first instance in ruling on a postjudgment motion for contractual attorney fees in an action that was not an action on the contract." (*Silverado, supra,* 197 Cal.App.4th at p. 311.) "The trial court's adjudication of the [plaintiff] to be in breach of the agreement—when the breach was claimed for the first time in a postjudgment attorney fees motion—deprived the [plaintiff] of the opportunity to fully litigate the issue of breach, including pleading and engaging in discovery on any defense to the claim, and

14

engaging in discovery on the issue of the parties' contractual intent as to any material contract terms it might claim are ambiguous."  (*Ibid.*)

In its reply brief AMS cites *Chinn v. KMR Property Management* (2008) 166 Cal.App.4th 175 (*Chinn* ) and *Allstate Ins. Co. v. Loo* (1996) 46 Cal.App.4th 1794 (*Allstate*) for the proposition that it was permissible to seek fees for the first time posttrial.  This contention is unavailing.

In *Silverado, supra,* 197 Cal.App.4th 282, this court distinguished *Chinn,* as that action was based upon a contract containing an attorney fee clause, and thus, "it was not necessary to pray for attorney fees in the complaint to recover contractual attorney fees as costs under Code of Civil Procedure section 1033.5, subdivision (a)(10), and due process was satisfied by a noticed motion for attorney fees. [Citation.]  However, a critical distinction between *Chinn* and the present case is the party seeking attorney fees in *Chinn* brought the motion for attorney fees in an action of the type contemplated by, and therefore within the scope of, the attorney fee provision in the parties' contract, to wit:  in an action in which the prevailing party unquestionably was entitled to attorney fees and costs under the subject contractual attorney fee provision." (*Silverado, supra,* 197 Cal.App.4th at p. 312.)

As this court further explained, "[b]ecause the attorney fee provision at issue in this case authorized the recovery of fees and costs incurred only as a result of the other party's breach of the agreement, the party seeking attorney fees and costs was required to plead and prove the other party's breach of the agreement as a prerequisite to being entitled to recover its attorney fees and costs.  The instant CEQA action was not within

15

the scope of the attorney fee provision because it was not an action for breach of the agreement. In fact, the agreement was not implicated in the present action until CCRC invoked it in its postjudgment motion for attorney fees and costs. For these reasons, the trial court erred in adjudicating the issue of breach of the agreement in the context of CCRC's motion for attorney fees and costs and in granting the motion." (*Silverado, supra,* 197 Cal.App.4th at p. 312.)

Likewise in this case, AMS did not sue on a contract containing an attorney fee provision. Rather, as we have discussed, *ante*, AMS brought its action based upon the purchase orders/invoices, which did not contain an attorney fee provision.

*Allstate* is distinguishable for the same reason. In *Allstate,* the lease at issue contained a provision "authorizing a 'reasonable attorney's fee' to the prevailing party 'In any legal action brought by either party to enforce the terms hereof or relating to the demised premises . . . .'" (*Allstate, supra,* 46 Cal.App.4th at pp. 1796-1797.) Again, no contract containing an attorney fees provision was sued upon by AMS in this action.

Moreover, AMS cannot invoke the "mutuality of remedy" provision of section 1717 as to SPD's cross-complaint. Courts apply section 1717 's mutuality of remedy provision "when a person sued on a contract containing a provision for attorney fees to the prevailing party defends the litigation 'by successfully arguing the inapplicability, invalidity, unenforceability, or nonexistence of the same contract.'" (*Santisas, supra,* 17 Cal.4th at p. 611.) "To ensure mutuality of remedy in this situation, it has been consistently held that when a party litigant prevails in an action on a contract by establishing that the contract is invalid, inapplicable, unenforceable, or nonexistent,

16

section 1717 permits that party's recovery of attorney fees whenever the opposing parties would have been entitled to attorney fees under the contract had they prevailed." (*Santisas,* at p. 611.)

When determining whether mutuality of remedy applies; that is, whether a particular action is "on a contract," courts look to the allegations of the unsuccessful party's pleading. (*Walsh v. New West Federal Savings & Loan Assn.* (1991) 234 Cal.App.3d 1539, 1547; *Manier v. Anaheim Business Center Co.* (1984) 161 Cal.App.3d 503, 508 ["Whether a party is entitled to attorneys fees for the purpose of invoking Civil Code section 1717 depends not on the evidence adduced at trial or some interim proceeding, but on the pleadings."].)

AMS asserts that because SPD alleged in its cross-complaint that AMS breached the draft manufacturing agreement, which contained an attorney fee clause, it was entitled to attorney fees under the mutuality of remedy doctrine. However, this contention is not supported by any citation to the record and is factually incorrect. As discussed, *ante*, SPD did *not* refer to the draft manufacturing agreement anywhere in its cross-complaint. Rather, as with the complaint, the cross-complaint was based on the purchase orders/invoices. Finally, as noted, *ante,* SPD did not pray for attorney fees in its cross-complaint.

## DISPOSITION

The order denying the motion for attorney fees is affirmed.  SPD shall recover its costs on appeal.

NARES, J.

WE CONCUR:

BENKE, Acting P. J.

HUFFMAN, J.

18